PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 07-9004
_____

ROBERT LARK

v.

*SECRETARY PENNSYLVANIA DEPARTMENT
OF CORRECTIONS, ET AL; THE DISTRICT ATTORNEY
OF PHILADELPHIA COUNTY;
THE ATTORNEY GENERAL OF THE STATE OF
PENNSYLVANIA,

                            Appellants

*(Pursuant to Rule 43(c), Fed. R. App. P.)
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 01-01252)
Honorable John R. Padova, District Judge
_____

Argued February 2, 2011

BEFORE:  McKEE, <u>Chief</u> <u>Judge</u>, and SCIRICA and
GREENBERG, <u>Circuit</u> <u>Judges</u>

(Filed: June 16, 2011)
_____

Maureen Kearney Rowley
Chief Federal Defender
Stuart B. Lev (argued)
Michael Wiseman
Defender Association of Philadelphia
Federal Capital Habeas Corpus Unit
The Curtis Center, Suite 545 West
Independence Square West
Philadelphia, PA 19106-0000

     <u>Attorneys for Appellee</u>

Thomas W. Dolgenos (argued)
Chief, Federal Litigation
Ronald Eisenberg
Deputy District Attorney
Law Division
Arnold H. Gordon
First Assistant District Attorney
Office of the District Attorney
Three South Penn Square
Philadelphia, PA 19107

     <u>Attorneys for Appellants</u>

_____

OPINION OF THE COURT
_____

GREENBERG, <u>Circuit</u> <u>Judge</u>.

## I.    INTRODUCTION

This matter comes on before this Court on appeal from a final order entered in the District Court on July 5, 2007, conditionally granting Appellee Robert Lark a writ of habeas corpus, vacating his Pennsylvania state court death sentence, and ordering the Commonwealth of Pennsylvania to retry Lark within 180 days or release him.[1]  <u>See</u> <u>Lark v. Beard</u>, 495 F. Supp. 2d 488 (E.D. Pa. 2007) ("<u>Lark</u> II").  The Court granted the writ based on Lark's claim that at his trial the Commonwealth violated the Fourteenth Amendment's Equal Protection Clause that the Supreme Court applied in <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S.Ct. 1712 (1986), when the Supreme Court reviewed a prosecutor's exercise of peremptory challenges in jury selection. Appellants, the Secretary of the Pennsylvania Department of Corrections, the District Attorney of Philadelphia County, and the Attorney General of the Commonwealth of Pennsylvania (collectively "the Commonwealth"), filed a timely notice of

---

[1] The District Court, at the unopposed request of the Commonwealth, issued an order on July 17, 2007, staying its conditional grant of habeas corpus relief pending the outcome of this appeal.

3

appeal from the Court's order. For the following reasons we will vacate the Court's July 5, 2007 order and remand the case for further proceedings.

## II.    BACKGROUND & PROCEDURE

We take the following facts from the Pennsylvania Supreme Court's opinion affirming the denial of Lark's first petition for state post-conviction relief:

> [I]n late 1978, Lark robbed Tae Bong Cho while putting a gun to the head of the victim's infant child. He was apprehended shortly after the robbery and was charged with the crime. Approximately two months later, Lark murdered Mr. Cho in order to prevent him from testifying against Lark in the robbery trial. No witness was able to identify the killer, because he wore a ski mask. However, Lark bragged to a number of acquaintances that he had killed 'the Korean.'
>
> Lark failed to appear for trial on the robbery charge and he was convicted in absentia. Thereafter, Lark repeatedly threatened the prosecutor in the robbery case and detectives investigating the Cho homicide. He was captured on January 9, 1980 after he took a mother and her two small children hostage. While he was barricaded inside the hostage's house, he told police: 'I'll kill you all like that [expletive] . . . I'll

4

shoot you in the legs.'

> Following capture, Lark was charged with offenses related to the murder of Mr. Cho, terroristic threats against the prosecutor in the robbery case, and the kidnapping of the woman and her two children. The first trial ended in mistrial as the result of an inadvertent question asked by the trial court . . . .

Commonwealth v. Lark, 698 A.2d 43, 46 (Pa. 1997).

At his second trial, in 1985, Peter Rogers represented Lark, who is African-American, and assistant district attorney John Carpenter represented the Commonwealth.[2] Voir dire lasted for four days.[3] On June 7, 1985, the third day of voir dire, after Carpenter exercised a peremptory challenge to strike a female African-American juror, the following exchange occurred:

> Mr. Rogers:   Your Honor, Before the other juror comes in, can we . . . may the

---

[2] Prior to his second trial, Lark moved to dismiss the charges against him on double jeopardy grounds. The trial court denied the motion and the Pennsylvania Superior Court, on interlocutory appeal, affirmed. Commonwealth v. Lark, 479 A.2d 522 (Pa. Super. Ct. 1984).

[3] Jury selection actually began on June 4, 1985, but inasmuch as the Court did not make any selections on that day, we are concerned only with June 5, 6, 7, and 10, 1985.

5

|   |   |
|---|---|
| | records be preserved to indicate the racial composition of the jurors who are coming by so as to preserve an opportunity for me to make a challenge that the Commonwealth may in fact be excluding all blacks who come before this panel? Only way I can determine that is if I have the records made available to me. Not today, Your Honor, but I just ask – |
| The Court: | What records are we talking about? |
| Mr. Rogers: | The records which will – that defense counsel doesn't get a chance to see and I guess the Commonwealth doesn't but I think it should indicate addresses, phone numbers, race, things like that, Your Honor. |
| Mr. Carpenter: | Judge– |
| The Court: | I don't know that there's any indication of race at all. |
| Mr. Carpenter: | My recollection is that– |
| Mr. Rogers: | As of this afternoon, Your Honor, he is striking all blacks. |
| Mr. Carpenter: | Oh. How awful. |

App. at 611-12.

The discussion between Rogers and the trial court continued with Rogers insisting that Carpenter was striking

6

blacks and asking the court to preserve a record of the race of the jurors. The trial court responded by asserting that there was "nothing on the record as to who was white and who was black," and that there was no way to determine the race of the jurors. Id. at 613. Rogers stated that he wanted the records preserved only from the last jury panel and he was not arguing that Carpenter had exercised his peremptory challenges in a discriminatory manner during the prior two days of jury selection. Carpenter stated, however, that he had not systematically excluded jurors, pointing out that there were three jurors on the panel of the same race as Lark. The trial court, applying the law as it stood at the time of the trial, indicated that "neither one of [the attorneys] has to give any reason for [exercising a peremptory challenge]." Id. at 614. Ultimately, the trial court denied Rogers' request, indicating that there was no record of the race of the jurors. Rogers did not raise the equal protection peremptory challenge issue again.

On June 28, 1985, the jury returned a verdict finding Lark guilty of first-degree murder, possession of an instrument of crime, terroristic threats, and two counts of kidnapping. In the penalty phase of the trial which followed, the jury found that there were no mitigating circumstances but that there was one aggravating circumstance--the murder of a state's witness--and set the penalty at death. The trial court denied all post-trial motions and imposed Lark's death sentence on April 24, 1986.

On April 30, 1986, six days after the court sentenced Lark, the United States Supreme Court issued its opinion in Batson v. Kentucky which lessened the burden of proof that Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824 (1965), had required for a defendant to show that a prosecutor engaged in

7

discriminatory jury selection. One year later, that Court determined that the rule in Batson would apply retroactively to all cases pending on direct review at the time that it decided Batson. Griffith v. Kentucky, 479 U.S. 314, 328, 107 S.Ct. 708, 716 (1987).

Lark filed a direct appeal from his conviction and sentence to the Pennsylvania Supreme Court.[4] On that appeal Lark, still represented by Rogers, did not raise a Fourteenth Amendment Equal Protection Clause claim based on Carpenter's use of peremptory strikes during voir dire. On May 20, 1988, the Pennsylvania Supreme Court affirmed Lark's convictions and sentence. Commonwealth v. Lark, 543 A.2d 491 (Pa. 1988). Lark did not file a petition for a writ of certiorari to the United States Supreme Court and thus the direct review of his conviction and sentence was completed on August 18, 1988, 90 days after the Pennsylvania Supreme Court affirmed his conviction. See U.S. Sup. Ct. R. 13. Nevertheless, inasmuch as Lark's direct appeal was pending at the time that the Supreme Court decided Batson, the rule in Batson is applicable to his case.[5]

After completion of Lark's direct appeal the judicial

[4] Under Pennsylvania law, all sentences of death are directly appealable to the state Supreme Court. 42 Pa. Cons. Stat. Ann. § 9711(h)(1) (West 1998); 42 Pa. Cons. Stat. Ann. § 722 (West 2004).

[5] Of course, the applicability of Batson is subject to the various jurisdictional and procedural rules that we discuss below.

proceedings in his case lay dormant as he did not file any further applications or motions until six years later when, in November 1994, after the Governor of Pennsylvania signed a warrant for his execution, he sought a stay of execution in the Philadelphia Court of Common Pleas. That court denied Lark's request for a stay on November 7, 1994, following which on November 8, 1994, Lark filed a pro se motion in the District Court seeking an order staying his execution. The District Court granted the stay to enable Lark to file a state post-conviction petition.[6]

On November 4, 1994, Lark filed his first Post Conviction Relief Act (PCRA), 42 Pa. Const. Stat. Ann. § 9541 et seq. (West 1989), petition in the Philadelphia Court of Common Pleas. After appointment of counsel, Lark filed an amended PCRA petition on February 8, 1995, raising 25 claims of trial court error and ineffective assistance of counsel but the claims did not include an assertion that there had been a Batson violation. The Commonwealth moved to dismiss the petition, and the PCRA court, without holding an evidentiary hearing, granted that motion. Lark appealed from the dismissal to the Pennsylvania Supreme Court.

In April 1997, while Lark's appeal was pending in the Pennsylvania Supreme Court, the Philadelphia District Attorney's Office released a video tape (the "McMahon tape")

---

[6] The Pennsylvania Supreme Court also issued a stay to permit the filing of a state post-conviction petition. See Commonwealth v. Lark, Capital Appeal No. 77 (Pa. Nov. 10, 1994) (unpublished order). See Lark v. Beard, Civ. No. A 01-1252, 2006 WL 1489977, at *2 (E.D. Pa. May 23, 2006).

in which former assistant prosecutor Jack McMahon instructs his prosecutorial colleagues to exclude potential jurors on the basis of race, gender, occupation, and neighborhood. On the tape that McMahon made after the Supreme Court's decision in Batson, he advised against striking all African-Americans and stated that his ideal jury would be composed of eight whites and four blacks.[7] On July 1, 1997, Lark applied to the Supreme Court of Pennsylvania for a remand of his PCRA petition to allow him to assert a claim based on the McMahon tape. On July 23, 1997, the Pennsylvania Supreme Court affirmed the denial of post-conviction relief and on July 30, 1997, in a separate order, it denied Lark's application for a remand. Commonwealth v. Lark, 698 A.2d at 52.

On August 29, 1997, Lark filed a second PCRA petition in the Court of Common Pleas. In his second petition, Lark advanced several claims predicated on newly discovered facts, including a claim of discriminatory jury selection based on: (1) the McMahon tape; (2) the prosecutor's allegedly discriminatory pattern of strikes; and (3) a report that Professors David Baldus and George Woodworth had authored on jury selection practices in Philadelphia capital cases from 1983-1993 ("the Baldus study"). Lark requested discovery and an evidentiary hearing to present evidence regarding the racial makeup of the jurors that Carpenter had struck and his motivation for striking the jurors. Lark also sought the hearing to present evidence regarding the

---

[7] For a more comprehensive discussion of the contents of the McMahon tape, see Wilson v. Beard, 426 F.3d 653, 656-58 (3d Cir. 2005).

jury selection policies of the Philadelphia District Attorney's office. The PCRA court, without holding an evidentiary hearing, denied the petition as untimely because Lark filed the petition beyond the one-year statute of limitations applicable to PCRA petitions. See 42 Pa. Stat. Ann. § 9545(b) (West 1998).

On appeal from the denial of post-conviction relief, the Pennsylvania Supreme Court held that Lark's Batson claim was timely to the extent it was based on the McMahon tape because the facts underpinning that claim did not become available until the Philadelphia District Attorney's Office released the tape in April 1997, and thus Lark's Batson claim insofar as based on the McMahon tape came within the exception to the one-year deadline for filing PCRA petitions predicated on newly discovered facts. See id. at § 9545(b)(ii); Commonwealth v. Lark, 746 A.2d 585, 588 (Pa. 2000). The court, however, affirmed the PCRA court's denial on the merits as it concluded that the contents of the McMahon tape did not demonstrate that Lark had made a prima facie showing that there had been discrimination in the jury selection at his trial. Id. at 588-89. The court also held that the remaining bases for Lark's Batson claims, namely the allegations arising from the race of each potential juror and the prosecutor's "Oh. How awful" statement at trial, were present at the inception of his trial and thus did not fall into an exception from the one-year rule in section 9545(b).[8]

---

[8] In an alternative holding, the Supreme Court held that Lark waived these claims because he did not raise them on direct appeal or in his first PCRA petition. Inasmuch as the parties agreed in the District Court that the Supreme Court applied only the PCRA time bar and not the doctrine of waiver to deny

While his appeal was pending from the denial of his second PCRA petition in the Pennsylvania Supreme Court, Lark, in recognition of the possibility that if he did not act promptly the Anti-Terrorism and Effective Death Penalty Act's (AEDPA) one-year statute of limitations would preclude him from seeking federal relief, filed a habeas corpus petition in the District Court. Lark admitted that his federal petition contained unexhausted claims that had been included in his second PCRA petition. The District Court dismissed the petition without prejudice but ordered that the filing date that Lark filed another petition would relate back to the date of the filing of the dismissed habeas corpus petition. See Lark v. Beard, Civ. No. A. 01-1252, 2006 WL 1489977, at *3 (E.D. Pa. May 23, 2006) ("Lark I").

On March 16, 2001, after the Pennsylvania Supreme Court denied Lark's appeal, he timely filed another habeas corpus petition in the District Court, this time raising 15 claims.[9]

---

Lark's Batson claims, we will not discuss the Supreme Court's waiver holding as a basis for procedural default. Lark v. Beard, Civ. No. A 01-1252, 2006 WL 1489977, at *5 n.8 (E.D. Pa. May 23, 2006).

[9] The claims were: (1) The prosecutor used his peremptory challenges in a racially discriminatory manner and as part of a discriminatory policy of the Philadelphia District Attorney's Office, in violation of the Sixth, Eighth and Fourteenth Amendments; (2) Trial counsel was ineffective during the guilt phase of the trial by failing to object to, and opened the door for, the admission of highly prejudicial, inadmissible evidence; and

he failed to investigate and present relevant and exculpatory evidence; (3) Trial counsel was ineffective at sentencing for failing to investigate, develop, prepare, or present available, relevant and compelling mitigating evidence regarding Lark's childhood abuse; deprivations and mental health impairments; and gave an ineffectual closing argument in which he failed to ask the jury to find mitigating evidence; (4) The trial court erred in answering the jury's question regarding the "meaning" of the death penalty in Pennsylvania; (5) Lark was forced to stand trial a second time in violation of the Double Jeopardy clause of the Fifth Amendment, after the prosecutor intentionally goaded defense counsel into requesting a mistrial; (6) Lark is entitled to relief from his death sentence because the penalty phase jury instructions and verdict sheet indicated that the jury must find mitigating factors unanimously; (7) The trial court's instructions on reasonable doubt at both phases of trial and on Lark's burden of proof at the penalty phase were unconstitutionally erroneous; (8) Lark did not receive the meaningful "proportionality review" that 42 Pa. Cons. Stat. Ann. § 9711(h)(3)(iii) (West 1998) and federal constitutional law mandated; (9) Lark's death sentence was the product of improper racial discrimination in violation of the U.S. Constitution; (10) The Philadelphia District Attorney's policy of providing lodging and cash payments to witnesses violates the U. S. Constitution; (11) Lark was denied his right to an impartial jury and a fair trial when some jury members saw him in handcuffs; (12) The trial court denied Lark a fair and impartial trial because the voir dire failed to ensure that the jurors selected would consider the possibility of a life sentence; (13) The trial court violated Lark's constitutional rights by refusing to sever unrelated criminal charges from his capital

13

Lark filed a motion for an evidentiary hearing on his habeas corpus petition but the Commonwealth objected to the granting of that hearing as it contended that he was not entitled to an evidentiary hearing on the Batson claim inasmuch as he failed to develop a factual record for that claim in the state court. The Commonwealth also objected to the Batson claim on the grounds that it was unexhausted and procedurally defaulted inasmuch as Lark failed to comply with the PCRA's one-year statute of limitations. See 42 Pa. Stat. Ann. § 9545(b).

In an order entered on May 23, 2006, the District Court held that Pennsylvania's one-year statute of limitations for PCRA petitions was not in force at the time of Lark's alleged default and, relying in part on our holding in Bronshtein v. Horn, 404 F.3d 700 (3d Cir. 2005), held that the time bar was not an independent and adequate state law barrier to federal habeas corpus review of Lark's claims. Lark I, 2006 WL 1489977, at *7. In a related holding, the Court determined that, inasmuch as the PCRA court and the Pennsylvania Supreme Court denied Lark's request for an evidentiary hearing pursuant to the same one-year statute of limitations which it had found to be an inadequate state ground to bar habeas corpus relief, Lark had not failed to develop the factual basis of his Batson claim to the end that 28 U.S.C. § 2254(e)(2) prevented the Court from

---

murder trial and when it allowed evidence of Lark's prior criminal activity to be introduced; (14) State court counsel was ineffective to the extent he failed to raise the claims Lark now raises; (15) Lark is entitled to relief from his conviction and sentence because of the prejudicial effects of the cumulative errors in his case.

14

exercising its discretion to grant him an evidentiary hearing. The Court also found that Lark alleged facts, which if proven true, would establish a prima facie showing that Carpenter exercised peremptory challenges based on race. In particular, Lark alleged that Carpenter's high strike rate of African-American jurors, the absence of any race-neutral reasons for the strikes in the transcripts, and the trial prosecutor's remark of "Oh. How awful" in response to defense counsel's comment that he was striking all the blacks from the jury, demonstrated a Fourteenth Amendment Equal Protection Clause violation. Finally, the Court exercised its discretion and granted Lark an evidentiary hearing on his claim of jury discrimination and ineffective assistance of counsel at the guilt and sentencing phases of his trial.[10]

At the evidentiary hearing on November 8, 2006, the Commonwealth presented Carpenter's testimony to answer the allegations that he struck jurors based on their race. Carpenter testified that at the time of Lark's trial he had been a prosecutor for ten years, and had not received formal training on jury selection practices, the Philadelphia District Attorney's Office did not have formal rules about how to make peremptory strikes, and, although he knew Jack McMahon, that he did not take directions from him on how to pick a jury. Apparently referring

---

[10] The Commonwealth has conceded that Lark's trial counsel was ineffective for failing to investigate and present mitigating evidence in the penalty phase of the trial. However, inasmuch as the Batson claim is the only issue before us on this appeal, we will not discuss the ineffective assistance of counsel claim any further.

15

to the time of the evidentiary hearing as McMahon did not make the tape until after Lark's trial, he said that while he had heard of the McMahon tape he had never seen it and was not familiar with its contents. Carpenter also stated that while he was aware that systematic exclusion of jurors based on race "wasn't right" under the law at the time of the trial, he was unsure, prior to Batson, whether the law permitted a prosecutor to strike individual jurors on the basis of their race. App. at 1021.

Carpenter further testified that he remembered Lark's trial because it was the only case in which he obtained a death sentence and because of his tense relationship with Rogers during the trial. In preparation for his testimony at the evidentiary hearing, Carpenter reviewed the transcript of the voir dire but he could not recall much of that process and could not recall specific jurors. Carpenter also reviewed the handwritten notes he took during jury selection, but they did not refresh his recollection of his reasons for his strikes of individual jurors and Carpenter testified that, while he used abbreviations and symbols, he was not systematic in his note-taking.[11]

_____

[11] The record contains only Carpenter's notes from the last two days of jury selection. We note that even these records are incomplete as some jurors questioned in the transcript do not appear on Carpenter's jury sheets. On the third day of the voir dire Carpenter wrote letter symbols such as "A," "D," "H," and "J," as well as word notations. On the fourth day, he used numbers corresponding to a key he placed at the bottom of the page. Carpenter identified the letter "D" as corresponding to a possible bias in favor of the defendant. He identified the symbol

The Commonwealth then questioned Carpenter about each of his individual peremptory strikes. Except as to one juror, Charles Rabb, Carpenter had no independent or refreshed recollection of reasons for any of the peremptory strikes he exercised during Lark's trial. However, based on the circumstantial evidence that Carpenter provided, the District Court found that the Commonwealth had offered race-neutral reasons for every peremptory strike the Commonwealth questioned him about except for three jurors. Inasmuch as the District Court later based its grant of the conditional writ on Carpenter's failure to provide a race-neutral explanation for these three jurors, we will focus on those jurors in this appeal. However, we think it is important to recognize that, despite our focus on these three jurors, on remand the District Court may conclude at the third step of the Batson process that any one of Carpenter's 13 peremptory strikes against African-Americans amounted to purposeful discrimination.

The first juror Carpenter could not recall striking and could not provide circumstantial evidence for removing was Shirley Sampson, an African-American female, who was the subject of his first peremptory challenge. Carpenter could not recall independently why he struck Sampson and when he read the transcript of her questioning his memory as to why he struck her was not refreshed. Carpenter, however, unequivocally denied that he struck her because she was African-American and

---

"H" as indicating juror hardship. Although Carpenter could not recall what the letter "A" symbolized, he denied that he used that letter to denote a venireperson as an African-American.

17

averred that striking any juror because of his or her race was legally and morally abhorrent to him.

Before proceeding to the next juror, the Commonwealth's attorney asked Carpenter questions about his general jury selection practices. Carpenter stated that the neighborhood where a potential juror lived was important because he did not want jurors who lived near the defendant or the place where the incident involved in the trial had occurred. Though Carpenter indicated that he did not want a juror who lived too close to the defendant or who lived close to the crime scene, he did not state that he struck Sampson for either of these reasons. Later, Carpenter testified that he took into account a potential juror's: (1) employment status and nature of employment, as having a job showed that person had roots in the community but that he nevertheless did not want teachers or social workers on the jury; (2) a juror's age, as older jurors were wiser and more responsible; (3) children, as Carpenter did not want jurors who had children who were the same age as the defendant; (4) home ownership, as a homeowner had a stake in the community; (5) hardship; (6) prior jury experience; (7) history as a victim of crime or a witness or defendant in a criminal case; (8) relationship with police officers, as Carpenter viewed jurors positively if they had family members who were police officers; (9) acquaintance with any potential witnesses in the trial; and (10) feelings about the death penalty.

The second venireperson for whom Carpenter could not give a specific reason, or a reason based on circumstantial evidence, for striking was Florence Williams, also an African-American female. Carpenter could not find anything "particularly wrong" with Williams by looking at the trial

18

transcript.  Id. at 1044.  He, however, did state that there were other circumstances that might not appear in the transcript, "[f]or example, if I don't like the juror, I think . . . it's a good bet she doesn't like me." Id. at 1045.  When the District Court stated that "there could have been body language there," Carpenter responded by saying "exactly."  Id.

As was the case with Williams, Carpenter could not recall a specific or circumstantial reason for striking the third juror, Edison Sisco,[12] an African-American male.  Carpenter, however, noted that neither he nor defense counsel asked Sisco many questions.  When asked whether there was anything in the transcript which might indicate why he struck Sisco, Carpenter answered "No.  Except one thing he said was, when he was asked when [sic] was the last school he attended, he said Dobbins and then he said 'No, Overbrook.'  I don't know it looks like he – I don't know." Id. at 1053.

After the hearing, the parties filed two stipulations as to the race of potential jurors that Carpenter struck and seated on the jury.  The stipulated list of 29 persons included the race and gender of the selected jurors, the selected alternates, and the prospective jurors that Carpenter excused with peremptory challenges.  According to the stipulations, the jury in Lark's case was composed of four African-Americans and eight Caucasians.  Carpenter did not exercise all of the peremptory

---

[12] Although the District Court referred to this juror as "Edison Cisco," the parties refer to him as "Edison Sisco," and his name appears as Sisco on the juror sheets from the trial. We will adopt the parties' spelling in this opinion.

19

strikes allotted to the prosecution and had five peremptory strikes remaining at the end of voir dire; however, out of the 15 peremptory strikes Carpenter used, 13 were used to strike African-Americans. Id. at 948-52.

On July 3, 2007, the District Court granted the writ on the strength of the Batson claim, ordering the Commonwealth to retry Lark within 180 days or release him. The Court examined Lark's claim under the familiar three-step Batson analysis:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

Miller-El v. Cockrell, 537 U.S. 322, 328-29, 123 S.Ct. 1029, 1035 (2003) (hereinafter "Cockrell") (citations omitted).

As we indicated above, the District Court, in its May 23, 2006 order holding that the one-year PCRA time bar was not an independent and adequate ground to bar Lark's petition in that Court, determined that Lark met the first step of the Batson

inquiry.[13]  At the second step, the Court determined that because Carpenter could not articulate a race-neutral reason for his peremptory strikes of Sampson, Williams, and Sisco, the Commonwealth failed to meet its burden of production.  The Court held that where the state fails to meet its <u>Batson</u> duty of production at step two, the analysis ends with a finding that there was a <u>Batson</u> violation.  The Court did not reach the issue of whether Lark's reliance on the Baldus study and the McMahon tape to prove discrimination at the third step supported his <u>Batson</u> claim.[14]  The Commonwealth filed a timely notice of appeal challenging the Court's conditional grant of the writ.[15]

## III.   JURISDICTION AND STANDARDS OF REVIEW

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 2241 and 2254 and we have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.  The parties dispute the appropriate standard of review.  They agree that we exercise plenary review over the Court's conclusions of law and review its factual

[13] Actually in its May 23, 2006 opinion and order the District Court merely indicated that Lark made allegations satisfying the first <u>Batson</u> step.

[14] The District Court did not address any of Lark's remaining guilt phase claims.

[15] The Commonwealth did not need a certificate of appealability to appeal.  <u>See</u> <u>Hardcastle v. Horn</u>, 368 F.3d 246, 253 (3d Cir. 2004).

findings for clear error.  See Holloway v. Horn, 355 F.3d 707, 713 (3d Cir. 2004).  But they differ with respect to the degree of deference that we must afford the Court's finding of intentional discrimination in the jury selection process.

Lark asserts that once a district court concludes that a petitioner has shown that there was intentional discrimination in the jury selection process, a court of appeals may not reject that determination unless the district court's conclusion is shown to be clearly erroneous.  Wilson v. Beard, 426 F.3d 653, 668-69 (3d Cir. 2005).  The Commonwealth characterizes this approach as too simple and incorrect for use in this case, as it argues that the District Court predicated its finding of intentional discrimination on a misapplication of Batson's legal principles.  Accordingly, the Commonwealth asserts that we exercise plenary review of the Court's finding.

Lark's citation of Wilson for the standard of review is misleading.  In Wilson, we upheld a district court's factual finding of intentional discrimination at the third step of the Batson analysis.  Id. at 670.  But the district court based that finding on its credibility determination that the prosecutor acted with a discriminatory intent in exercising his peremptory strikes.  Id.  Here, the District Court did not base its decision on a credibility determination nor did it proceed to the third step of the Batson analysis.  Rather, the Court ruled that the Commonwealth did not offer any explanation for making the three peremptory strikes and, therefore, as a matter of law, it failed to meet its burden at step two of the Batson analysis.  But the Court's approach here was problematic, for we have stated, "the Batson inquiry ends and the conviction must be vacated at the second stage of the analysis if the state's explanation is such

22

that, taken at face value, it either demonstrates an equal protection violation or would otherwise be inadequate as a matter of law to support the conviction." Johnson v. Love, 40 F.3d 658, 668 (3d Cir. 1994) (internal citation omitted). Therefore, because the District Court did not indicate that Carpenter's explanations at step two demonstrated an equal protection violation, the Court necessarily determined that Carpenter's explanations for using peremptory challenges to strike Sampson, Williams, and Sisco were inadequate as a matter of law. We will exercise plenary review over that legal conclusion. See Whitney v. Horn, 280 F.3d 240, 249 (3d Cir. 2002).

## IV. DISCUSSION

### A. Timely Batson Objection

First, the Commonwealth argues that Lark did not make an adequate "Batson-style objection at trial," and therefore, under our precedent, he is not entitled to relief on the Batson claim. Appellant's br. at 13. Lark counters by asserting that the Commonwealth impermissibly is raising this argument on appeal for the first time. In reply, the Commonwealth asserts that it raised the issue at several points in its original response to the petition. Further, the Commonwealth argues that, inasmuch as we have held that a timely objection at trial is required to preserve a Batson claim, Lark has the burden to prove that he raised a timely Batson objection at trial and thus the Commonwealth did not need to raise the issue as an affirmative defense. See Lewis v. Horn, 581 F.3d 92, 101-02 (3d Cir. 2009).

23

The Commonwealth argues that, in any event, in these habeas corpus proceedings it raised Lark's failure to object by stating, in its response to Lark's petition, that: (1) defense counsel "objected to, at most, four peremptory challenges which the prosecutor had made during the afternoon session of June 7, 1985"; (2) "trial counsel did not specify the exact strikes to which he was objecting"; (3) "as a result of [Lark's] dereliction in pursuing the Batson claim in state court, the record was not preserved"; (4) "[T]he record reflects that defense counsel told the court he had what he needed to make a record, but he never raised the subject again." Appellant's reply br. at 5 (internal citations and quotation marks omitted).

These statements, however, did not put the District Court on notice of the legal argument that the Commonwealth now wishes to raise: that Lark's objection at trial was not sufficient and timely and Lark therefore has waived the Batson claim for the purposes of federal habeas corpus review.[16] See Bagot v. Ashcroft, 398 F.3d 252, 256 (3d Cir. 2005) (stating that the crucial question regarding waiver is whether the petitioner presented the argument with sufficient specificity to alert the district court). It is unsurprising, therefore, that the District

---

[16] In fact, as Lark points out, the Commonwealth consistently accepted the adequacy of Rogers' objection in several documents submitted to the District Court. See, e.g., Commonwealth's Memorandum of Law, Lark v. Beard, 01-cv-1252, at 38 ("On June 7, 1985, petitioner objected to certain peremptory strikes of the prosecutor.").

24

Court did not address this argument either in its May 23, 2006 order granting an evidentiary hearing or in its July 3, 2007 order granting the conditional writ. The Court only held that "Lark's trial counsel, Peter Rogers, raised the issue of the Commonwealth's improper peremptory strikes during the voir dire and sought to preserve a record of the racial composition of the jury." 495 F. Supp. 2d at 492. "As a general rule, we do not consider on appeal issues that were not raised before the district court." Appalachian States Low-Level Radioactive Waste Comm'n v. Pena, 126 F.3d 193, 196 (3d Cir. 1997) (internal quotation marks omitted). Nevertheless, in Appalachian States we noted that the enforcement of a waiver involves the exercise of discretion and thus the rule providing for waiver may be relaxed "whenever the public interest or justice so warrants." Id. (citations and internal quotation marks omitted). But even if we held that it was appropriate to relax the ordinary appellate review rule in order to consider the issue that the Commonwealth raises, i.e., that Lark did not make an adequate Batson objection at his trial, and we agreed with the Commonwealth that a defendant must make a timely Batson objection at trial to preserve a Batson issue and that the requirement that he do so cannot be waived, we would find that Lark made a timely objection at trial so as to preserve the Batson issue for later habeas corpus review.

We have held that, even in trials before the Supreme Court's decision in Batson, a timely objection to the prosecutor's exercise of peremptory strikes is a prerequisite to raising a Batson claim on appeal. Lewis v. Horn, 581 F.3d at 102, citing Abu-Jamal v. Horn, 520 F.3d 272, 284 (3d Cir. 2008), vacated on other grounds sub nom., Beard v. Abu-Jamal,

25

130 S.Ct. 1134 (2010).[17] We explained that, "a timely objection of racial bias involving jury composition would have alerted the judge to errors that might be corrected in the first instance and given the judge the opportunity to develop a complete record of the jury selection process for appellate review." Abu-Jamal, 520 F.3d at 282. Thus, in Abu-Jamal the petitioner forfeited his Batson claim because he "did not object to the prosecutor's use of peremptory challenges at any point during voir dire or at his 1982 trial." Id. at 283-84. Likewise, in Lewis we held that the petitioner's statement of "So prejudiced. So prejudiced," and "I knew he would do that" after the prosecution's use of peremptory strikes was not sufficient to alert the trial judge to a claim that the prosecution was striking venire members in a racially discriminatory manner. Lewis, 581 F.3d at 102.

As was true for the petitioners in Lewis and Abu-Jamal, Lark's trial was prior to the Supreme Court's decision in Batson and thus was at a time that Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, set forth the standard governing the review of the use of peremptory challenges. In order to show a Fourteenth Amendment Equal Protection Clause violation under Swain, the defendant had "to show a pattern and practice of racial

---

[17] On the remand from the Supreme Court we adhered to the result we reached in our vacated opinion and affirmed the district court's order granting the petitioner habeas corpus relief to the extent that he had been sentenced to death in the state court. Abu-Jamal v. Sec'y Pa. Dep't of Corr., No. 01-9014, ____ F.3d. ____, 2011 WL 1549231 (3d Cir. Apr. 26, 2011). But our opinion on the remand does not affect the dispositions for which we cite our earlier opinion in that case in this opinion.

26

discrimination in jury selection across multiple prosecutions," Sistrunk v. Vaughn, 96 F.3d 666, 668 (3d Cir. 1996), but the prosecutor did not need to give reasons for the use of individual peremptory challenges to avoid a finding that there had been an equal protection violation. See Swain, 380 U.S. at 222, 85 S.Ct. at 837. An equal protection objection under Swain, however, "necessarily states an equal protection violation subject to proof under the Batson standard . . . ." Ford v. Georgia, 498 U.S. 411, 420, 111 S.Ct. 850, 856 (1991).

Here it is clear that Rogers, Lark's trial attorney, raised a timely objection to what he perceived was the prosecutor's exercise of discriminatory peremptory challenges. At the trial on June 7, 1985, Rogers asked that:

> [T]he records be preserved to indicate the racial composition of the jurors who are coming by so as to preserve an opportunity for me to make a challenge that the Commonwealth may in fact be excluding all blacks who come before this panel? Only way I can determine that is if I have the records made available to me.

App. at 611-12.

Counsel later stated that "as of this afternoon, your honor, he is striking all blacks." Id. at 612. The trial court refused to make a record as it stated that there was no way to determine a person's race or color and that neither attorney had to explain his reasons for exercising peremptory challenges. Rogers'

27

statements that the prosecutor was striking all of the black jurors put the trial court on notice of Lark's claim and distinguishes his case from <u>Lewis</u> and <u>Abu-Jamal</u>. Specifically, Rogers timely pointed out what he perceived was the Commonwealth's racially motivated peremptory strikes and he thus invited the trial court to develop a record on the issue for appellate review. This notice was all that <u>Abu-Jamal</u> requires. <u>See</u> <u>Williams v. Beard</u>, 637 F.3d 195, 208 n.12 (3d Cir. 2011).

The Commonwealth's contentions that Rogers only made a "vague request for records," did not ask the trial court to order Carpenter to explain himself, and only questioned the challenge of four jurors, do not demonstrate that Rogers did not make an objection at trial to the allegedly race based peremptory challenges. Appellant's reply br. 8-10 (internal quotation marks omitted). It would have been futile for Rogers to ask that Carpenter be required to explain the reason for his individual peremptory challenges or for Rogers to renew the objection when each African-American juror was excused for under the Supreme Court case law at the time of Lark's trial, individual challenges in one case could not be the basis for finding that there had been an equal protection violation.[18] <u>See</u> <u>Swain</u>, 380

---

[18] The Commonwealth cites <u>Galarza v. Keane</u>, 252 F.3d 630, 638 (2d Cir. 2001), for the proposition that a party must raise an objection in a manner that would allow a trial court to remedy the problem at trial. <u>Galarza</u> is inapposite because the trial in that case occurred three years after the Supreme Court's decision in <u>Batson</u>. <u>Id.</u> at 633.

U.S. at 222, 85 S.Ct. at 837. Indeed, the trial court indicated as much when it stated that neither Carpenter nor Rogers had to explain the reasons behind individual peremptory strikes.

We think it is also significant that even Carpenter recognized that Rogers was attempting to raise a Fourteenth Amendment Equal Protection argument when Carpenter stated, referring to the <u>Swain</u> standard, that "there's obviously not systematic exclusion when you've got 3 members out of 9 who are the same race as the defendant and his attorney." App. at 616; <u>see</u> <u>Swain</u>, 380 U.S. at 227, 85 S.Ct. at 839. Further, Rogers' request for a record of the race of the jurors that Carpenter struck sought the type of evidence that would support (or refute) an equal protection violation under <u>Swain</u>. <u>See</u> <u>id.</u> at 223, 85 S.Ct. at 837 ("[W]hen the prosecutor in a county, in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries, the Fourteenth Amendment claim takes on added significance.").

Therefore, even though Rogers' statement that Carpenter was striking "all the blacks" from the jury and his request that the trial court make a record of the race of the jurors did not raise an objection with "the clarity that appropriate citations would have promoted," his protest reasonably raised an equal protection claim under <u>Swain</u>. <u>Ford</u>, 498 U.S. at 418, 111 S.Ct. at 855. Thus, the objection was adequate to raise an equal protection claim under <u>Batson</u>. <u>Id.</u> at 420, 111 S.Ct. at 856.

29

Finally, the Commonwealth argues that, even if Lark properly objected to Carpenter's peremptory strikes so as to raise an equal protection claim, the trial court's rejection of that objection is entitled to deference. It is true that in the habeas corpus context federal courts owe the same deference to implicit state court factual findings as they afford to explicit state court factual findings. See, e.g., LaVallee v. Delle Rose, 410 U.S. 690, 692, 93 S.Ct. 1203, 1204 (1973) (per curiam); Campbell v. Vaughn, 209 F.3d 280, 286 (3d Cir. 2000) ("[A]n implicit finding of fact is tantamount to an express one, such that deference is due to either determination."). Here, however, the trial court's response that it was impossible to determine the race of the jurors and that counsel did not have to give reasons for peremptory challenges, clearly was a refusal to engage in an equal protection analysis rather than an implicit finding of fact entitled to deference under 28 U.S.C. § 2254(e)(1). Cf. Campbell, 209 F.3d at 289-90 (holding that state court made implicit credibility finding entitled to deference where court repeatedly stated that petitioner's ineffective assistance of counsel claim had no legal merit); see also Coombs v. Diguglielmo, 616 F.3d 255, 263 (3d Cir. 2010) (citation omitted) ("Where the state court fails to undertake a full step-three analysis, as required by Batson, we will remand for the district court to engage in independent fact-finding.").[19]

---

[19] Of course, we do not fault the trial court for failing to engage in the three-step analysis at a time that the Supreme Court had not announced that a court should engage in that analysis. However, the trial court, by refusing to make a record of the race of the struck jurors, failed even to undertake or at least

30

In sum, even though Lark did not present his equal protection claim with great clarity at the trial we will not reject his <u>Batson</u> claim on the basis that he failed to advance a timely <u>Batson</u> objection at trial.

**B.      Procedural Default**

We next consider whether Lark procedurally defaulted his <u>Batson</u> claim by failing to advance it properly in the Pennsylvania courts.  There has been a procedural default when "a state court declined to address a prisoner's federal claims because the prisoner failed to meet a state procedural requirement."  <u>Coleman v. Thompson</u>, 501 U.S. 722, 730, 111 S.Ct. 2546, 2554 (1991).  As a matter of comity and federalism, a federal court may not conduct habeas corpus review of a claim which a petitioner has procedurally defaulted in state court.  Federal review, however, is available if the procedural rule that the state court applied to bar a federal claim was not "independent" and "adequate."  <u>See</u> <u>Albrecht v. Horn</u>, 485 F.3d 103, 115 (3d Cir. 2007) (internal citations omitted).  A state procedural rule is an inadequate ground to bar federal review if it was not firmly established and regularly followed by the state courts at the time it was applied.  <u>Bronshtein</u>, 404 F.3d at 707.  Whether a procedural rule "was firmly established and regularly applied is determined as of the date the default occurred, and not as of the date the state court relied on it, because a petitioner is entitled to notice of how to present a claim in state court."  <u>Albrecht</u>, 485 F.3d at 115 (internal citations omitted).

initiate an analysis under the standard then in effect under <u>Swain</u>.

31

Lark first attempted to raise a specific claim under Batson when he unsuccessfully sought an order from the Pennsylvania Supreme Court remanding his PCRA petition to the PCRA court so that he could raise a Batson claim. Thereafter Lark filed a second PCRA petition in 1997 raising a Batson violation as a ground for relief and requesting that the court grant him an evidentiary hearing to present proof of the race of the venirepersons at his trial and to enable him to advance the McMahon tape in support of his claim. The PCRA court, without holding an evidentiary hearing, dismissed the petition as untimely under the PCRA deadline set forth in 42 Pa. Cons. Stat. Ann. § 9545(b).

On appeal from the dismissal of the second PCRA petition, the Pennsylvania Supreme Court invoked section 9545(b)(1)(ii)[20] to hold that the petition so far as it asserted a Batson claim was timely but only to the extent that Lark predicated the claim on the McMahon tape. 746 A.2d at 588. Thus, the court held that it could not review the Batson claim to the extent Lark predicated it on the Baldus study, the prosecutor's "Oh. How awful," statement, and the race of the potential jurors inasmuch as those aspects of the claim were ascertainable more than one year before Lark filed his second PCRA petition, and a Batson claim on any of these three bases did not fall within the exception set forth in section

---

[20] Section 9545(b)(1)(ii) provides that a claim is not untimely if "the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence."

9545(b)(1)(ii). Id. at 589. On the merits, the court held that the McMahon tape was not sufficient to establish a policy of discrimination by the prosecutors in the Philadelphia District Attorney's Office. Id. (citing Commonwealth v. Rollins, 738 A.2d 435, 443 n.10 (Pa. 1999)).

As we recently discussed in Morris v. Beard, 633 F.3d 185 (3d Cir. 2011), the PCRA one-year statute of limitations in 42 Pa. Cons. Stat. Ann. § 9545(b) was not firmly established and regularly followed prior to 1998:

> In Bronshtein, we explained that the PCRA's one-year statute of limitations was not an adequate state bar to federal habeas review of claims defaulted prior to, at the very least, October 20, 1998. [Bronshtein, 404 F.3d] at 709. Before that date, Pennsylvania courts frequently applied a 'relaxed waiver' rule in capital cases. Id. In other words, courts refused to enforce procedural rules--such as the PCRA's one-year statute of limitations--in capital cases because of the 'overwhelming public interest in preventing unconstitutional executions.' Id. at 708 (quoting Commonwealth v. McKenna, 476 Pa. 428, 383 A.2d 174, 180-81 (Pa. 1978)) (internal quotation marks omitted). Although a trio of Pennsylvania Supreme Court decisions in 1998 and 1999 interred the relaxed waiver doctrine, see, e.g, Commonwealth v. Banks, 556 Pa. 1, 726 A.2d 374 (Pa. 1999), we observed in Bronshtein that it was not clear that the rule would be unavailable as of October 20, 1998--the date of Bronshtein's

33

> default. See 404 F.3d at 709-10. Because the
> PCRA's one-year statute of limitations 'was not
> firmly established and regularly followed' as of
> that date, we held it was an inadequate state bar to
> federal habeas review of Bronshtein's claims. Id.

Morris, 633 F.3d at 191.

Here, the default in the timeliness of the filing of Lark's second PCRA petition was on January 16, 1996,[21] or the effective date of the PCRA time bar, at a time that the PCRA one-year time bar was not firmly established due to the

---

[21] The District Court set the default date as August 18, 1989, or one year after completion of the direct appeal in Lark's case, but that date fails to account for the statutorily created one-year grace period for filing PCRA petitions where, as here, the judgment of sentence became final before the effective date of the time bar, or January 16, 1996. See Commonwealth v. Peterkin, 722 A.2d 638, 641 (Pa. 1998). Lark's first PCRA petition, filed in 1994 and thus before the one-year deadline, was not subject to the one-year deadline. Inasmuch as the grace period does not apply to second or subsequent petitions, the date of default for the second petition is the effective date of the time bar or January 16, 1996. See Commonwealth v. Crawley, 739 A.2d 108, 109 (Pa. 1999). As a matter of law, however, the error has no consequence on this appeal because the relaxed waiver rule was followed in Pennsylvania until after the default here.

34

Pennsylvania Supreme Court's "relaxed waiver" rule. [22] Bronshtein, 404 F.3d at 708 (citing Commonwealth v. McKenna, 383 A.2d 174 (Pa. 1978)). Therefore, as we held in Bronshtein and most recently re-affirmed in Morris in a similar situation, the one-year PCRA time bar cannot justify a federal court determination that Lark's Batson claim has been procedurally defaulted.

The Commonwealth argues that the state time-bar rule was an adequate basis to find that Lark had procedurally defaulted his Batson claim because he had notice of the time bar which the Pennsylvania General Assembly made explicitly applicable to capital cases and, further, that the Pennsylvania Supreme Court never applied the relaxed waiver rule to the time bar. But our reasoning in Bronshtein refutes these arguments and we have reaffirmed the Bronshtein reasoning in subsequent cases and, therefore, we need not address the Commonwealth's arguments any further.[23] See Morris, 633 F.3d at 195; Holland v. Horn, 519 F.3d 107, 115 (3d Cir. 2008).

In holding that the time bar was not an independent and

---

[22] The Pennsylvania Supreme Court since has made it clear that it no longer would relax procedural requirements in capital cases. See Whitney v. Horn, 280 F.3d 240, 251 n.12 (3d Cir. 2002).

[23] The Commonwealth seems to acknowledge this point, stating that it was including the procedural default argument in order to preserve the issue for "possible en banc or Supreme Court review." Appellant's br. at 34.

adequate state ground for denying relief for purposes of a later procedural default analysis in a federal district court, we have considered the two most recent Supreme Court decisions addressing the adequate and independent state rule doctrine, Walker v. Martin, 131 S.Ct. 1120 (2011), and Beard v. Kindler, 130 S.Ct. 612 (2009). In Kindler, the Court considered a very narrow question not implicated here: whether a state procedural ground is automatically inadequate and unenforceable on federal habeas corpus review because the state procedural rule is discretionary rather than mandatory. Id. at 614-15.[24] Similarly, in Walker the Court held that California's judge-made rule that a state habeas corpus petition "should be filed as promptly as the circumstances allow . . ." is an independent and adequate state rule for purposes of procedural default. Walker, 131 S.Ct. at 1125 (internal quotation marks and citation omitted). The Court held that the California rule, though discretionary, met the "firmly established" criterion because the California courts' application of the rule in particular circumstances supplied the requisite clarity for habeas corpus petitioners. Id. at 1128.

---

[24] Kindler vacated our decision in Kindler v. Horn, 542 F.3d 70 (3d Cir. 2008), in which we held that the Pennsylvania fugitive forfeiture doctrine pursuant to which the petitioner's conviction was affirmed did not provide an adequate basis to bar federal habeas corpus review. On the remand from the Supreme Court we adhered to our prior result on the ground that the Pennsylvania courts rather than applying a discretionary rule "applied a mandatory rule that represented a break from past decisions." Kindler v. Horn, No. 03-9010,____ F.3d ____, ____, 2011 WL 1602083, at *1 (3d Cir. Apr. 29, 2011).

36

Further, the rule was "regularly followed" even though at times the California courts bypassed the rule and summarily dismissed petitions on the merits. Id. at 1129.

The Supreme Court's holdings in Walker and Kindler have not affected our holding in Bronshtein that prior to 1998 capital petitioners in Pennsylvania could rely on state courts to relax procedural rules, including the one-year PCRA time bar. Bronshtein, 404 F.3d at 709.[25] Both Walker and Kindler concerned discretionary and independent state procedural rules which state courts consistently applied to bar federal claims. In contrast, Pennsylvania's PCRA time bar is a facially mandatory state procedural rule which was not clearly followed in capital cases at the time of Lark's state court default due to the Pennsylvania Supreme Court's judicially created doctrine of "relaxed waiver." See, e.g., Bostick v. Stevenson, 589 F.3d 160, 165 n.6 (4th Cir. 2009) ("We do not read Kindler to apply to facially mandatory rules that state courts nonetheless apply arbitrarily."). Indeed, by the Pennsylvania Supreme Court's own recognition, the "relaxed waiver" rule "virtually eliminated any semblance of finality in capital cases . . . ." Commonwealth v. Albrecht, 720 A.2d 693, 700 (Pa. 1998). Thus, it cannot be argued plausibly that the PCRA time bar regularly was followed or firmly was established at the time of Lark's procedural default in 1996.

## C.    District Court Evidentiary Hearing

---

[25] In any event, as we noted above, we applied Bronshtein's rule after the Supreme Court decided Kindler. See Morris, 633 F.3d at 195.

37

The Commonwealth argues that, even assuming Lark's Batson claim is not procedurally defaulted, the District Court should not have held an evidentiary hearing on the claim inasmuch as Lark was not sufficiently diligent in pursuing his Batson claim in state court as 28 U.S.C. § 2254 requires. Section 2254(e)(2) provides that,

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –

> (A)    the claim relies on—

> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

> (B)    the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

38

28 U.S.C. § 2254(e)(2).

The Supreme Court has held that a failure to develop the factual basis of a claim in the opening clause of section 2254(e)(2) "is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." Williams v. Taylor, 529 U.S. 420, 432, 120 S.Ct. 1479, 1488 (2000). The Court distinguished the diligence requirement of the opening clause of section 2254(e)(2) from the diligence requirement of section 2254(e)(2)(A)(ii) by explaining that the latter refers to cases in which the facts underlying a claim could not have been discovered through due diligence while the former asks only whether "the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court . . . ." Id. at 435, 120 S.Ct. at 1490.

Thus, there is a separate fault requirement in the opening clause of section 2254(e)(2) which asks whether the petitioner adequately and diligently pursued the factual basis of his claim in state court. If the petitioner fails in this regard and is therefore "at fault," the bar to relief in section (e)(2) is raised. Otherwise, if the petitioner is not "at fault," the court may exercise its discretion to grant an evidentiary hearing. See Campbell, 209 F.3d at 287 (stating that if section 2254(e)(2) does not bar an evidentiary hearing, federal courts have discretion to grant a hearing with the potential to advance the petitioner's claim). Here, the District Court held that because the state court denied Lark's request for an evidentiary hearing based on an inadequate procedural rule, Lark did not fail to develop the Batson claim and section 2254(e)(2) did not bar a hearing in that Court. See Morris, 633 F.3d at 194-95 (citing

39

Wilson, 426 F.3d at 665).  The Court, after finding section 2254(e)(2) inapplicable, exercised its discretion to grant Lark an evidentiary hearing.

The Commonwealth contends that the District Court improperly conflated diligence and procedural default.  In Wilson we stated that the procedural default doctrine and section 2254(e)(2)'s diligence requirement analytically were linked: "If a petitioner requests a hearing to develop the record on a claim in state court, and if the state courts . . . deny that request on the basis of an inadequate state ground, the petitioner has not 'failed to develop the factual basis of [the] claim in State court proceedings' for the purposes of § 2254(e)(2)."  Wilson, 426 F.3d at 665.  Nevertheless, the Commonwealth argues that the diligence standard sets a different and higher bar than the procedural default doctrine and dismissal on the basis of an inadequate procedural rule does not excuse years of dilatoriness in state court.  The Commonwealth also argues that Wilson is distinguishable because McMahon himself prosecuted the petitioner in that case and the petitioner could not have brought the claim earlier because the tape was the "centerpiece" of his Batson claim.  Id. at 666 n.11.  As the Commonwealth is quick to point out, Lark was aware of the factual predicates of his Batson claim – the pattern of the prosecution's strikes, the race of the jurors, and the prosecutor's statement – as early as his trial counsel's objection during the jury selection process of his case.

The Commonwealth makes a strong argument, particularly inasmuch as the years of delay between the District Court evidentiary hearing and the trial greatly prejudiced its ability to respond to the Batson claim.  As the Supreme Court

40

has noted, the principles of comity and federalism underlie the diligence requirement:

> Comity . . . dictates that when a prisoner alleges that his continued confinement for a state court conviction violates federal law, the state courts should have the first opportunity to review this claim and provide any necessary relief. For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error.

Williams, 529 U.S. at 437, 120 S.Ct. at 1490-91 (internal citation and quotation marks omitted).

It is undoubtedly reasonable to argue that Lark's failure to raise the Batson claim on direct appeal followed by his inaction for six years before filing a post-conviction petition, which even then did not raise a Batson claim, demonstrated that he did not make a "diligent search for evidence." Id. at 435, 120 S.Ct. at 1490. Moreover, Rogers, who was Lark's counsel on his direct appeal as well as at trial, was clearly aware of a potential discriminatory jury selection claim for, as we have discussed, he raised an objection to the prosecution's strikes during voir dire. Thus, though the McMahon tape and the Baldus study may not have alerted Lark to a possibility of there having been a "culture of discrimination" [26] in the Philadelphia

---

[26] The District Court noted that the McMahon tape "could conceivably reflect a culture of discrimination that is relevant to . . . Lark's Batson/Swain claim." Lark I, 2006 WL 1489977, at

41

District Attorney's Office until after his trial and direct appeal in this case, see Cockrell, 537 U.S. at 347, 123 S.Ct. at 1045, we reject Lark's argument that he could not have been aware of his Batson claim given the information available at the time of his direct appeal and we also reject his argument that he could not have discovered the claim through the exercise of a reasonable investigation. Cf. Williams, 529 U.S. at 439-40, 120 S.Ct. at 1492 (holding that petitioner failed to develop facts of Brady claim where counsel was a aware of psychiatric report but failed to investigate in anything but a "cursory manner"). After all, the jury selection process took place in front of him. Moreover, inasmuch as a Batson claim, unlike a Swain claim, can be proven by the facts in a single case relating to jury selection, Lark did not need "culture of discrimination" materials to establish his claim.

We nevertheless reject the Commonwealth's arguments regarding the delay in this case because, after the Commonwealth submitted its brief on this appeal but before the oral argument, we rejected an almost identical argument in Morris. In that case, the petitioner, Kelvin Morris, was convicted of first-degree murder and sentenced to death in Pennsylvania state court. After he filed an unsuccessful direct appeal and an unsuccessful PCRA petition, Morris filed a second PCRA petition in which he raised, for the first time, a claim that his trial attorney's representation of his brother, Artie

---

*8 n.15. We, however, since have held that a district court did not clearly err in finding that the McMahon tape did not create a culture of discrimination in the Philadelphia District Attorney's Office. Bond v. Beard, 539 F.3d 256, 273 (3d Cir. 2008).

Morris, in a civil suit created a conflict of interest that deprived Morris of effective assistance of counsel in his criminal trial. Morris, 633 F.3d at 190. The PCRA court dismissed the second petition without holding an evidentiary hearing for the sole reason that Morris filed the petition beyond the PCRA's one-year statute of limitations. Id. Morris then filed a federal habeas corpus petition raising the same claim and requesting an evidentiary hearing. The Commonwealth, as it does in this case, argued that, because of the lengthy delay and the timing of Morris' claim,[27] section 2254(e)(2) barred the district court from holding an evidentiary hearing.

Inasmuch as the petitioner in Morris and Lark are in almost identical procedural postures, we will quote from our opinion in Morris at length:

> One might argue that [Morris'] failure to comply with the PCRA's one-year statute of limitations means that he did not seek a hearing 'in the manner prescribed by state law.' Williams, 529 U.S. at 427, 129 S.Ct. at 1485-86. But such an argument runs headlong into our holding in Bronshtein, where we observed that the PCRA's time bar was neither 'firmly established' nor 'regularly followed' at the time [Morris] filed his second PCRA petition. 404 F.3d at 709-10. Because of the uncertainty surrounding Pennsylvania's use of the 'relaxed-waiver rule' at that time, it was effectively impossible for

[27] Morris filed the claim 13 years after the trial and one month after his brother died.

[Morris] to fail to comply with Pennsylvania law on statute of limitations grounds when filing his second PCRA petition. In Williams, the Supreme Court explained that a finding of diligence would turn on whether a petitioner 'made a reasonable attempt' to pursue his claim 'in light of the information available at the time.' 529 U.S. at 435, 129 S.Ct. at 1490. With no 'firmly established and regularly applied rule' clearly barring [Morris'] lengthy delay, Bronshtein, 404 F.3d at 708, his belated hearing request was an acceptable attempt to pursue his claim in light of the information available to him at the time of filing. Because the Pennsylvania state courts failed to hold a hearing and rule on [Morris'] conflict-of-interest claim 'for some reason unrelated to [his] diligence, § 2254(e)(2) [does] not apply and a new evidentiary hearing [is] permitted.' Taylor v. Horn, 504 F.3d 416, 436 (3d Cir. 2007).

As the Commonwealth correctly argues, merely because a petitioner has complied with state law when seeking an evidentiary hearing does not mean that he has been diligent for purposes of § 2254(e)(2). The jurisdictional standard for procedural default of § 2254(a) and the evidentiary hearing standard of § 2254(e)(2) are distinct provisions that will frequently require separate analyses. But where, as here, a state court gives no reason for denying a petitioner's hearing

> request other than his failure to comply with a
> subsequently invalidated state statute of
> limitations, we cannot say that the petitioner was
> not diligent for purposes of § 2254(e)(2).
> Accordingly, we hold that § 2254(e)(2) did not
> prohibit the District Court from conducting an
> evidentiary hearing on [Morris'] conflict-of-
> interest claim.

Morris, 633 F.3d at 195-96 (emphasis added).

In a letter filed pursuant to Fed. R. App. P. 28(j), the Commonwealth attempts to distinguish Morris by arguing that the rule we established in that case was the following: "where a petitioner had the opportunity and forum to litigate the merits of the claim in state court, but failed to do so, he is not diligent under [section] 2254(e)(2) even though his later attempt to raise the again [sic] is barred by an inadequate rule." Appellant's 28(j) letter dated January 31, 2011, at 1-2. But as the excerpted portion above demonstrates, this is a misstatement of Morris' holding. Rather, the holding in Morris was that section 2254(e)(2) does not bar an evidentiary hearing for lack of diligence where the only reason a state court gives for denying an evidentiary hearing is a subsequently invalidated state procedural rule. This is exactly what happened in Lark's case.[28]

---

[28] We are also unconvinced by the Commonwealth's attempt to distinguish Morris on the ground that the conflict of interest claim in that case, unlike Lark's Batson claim, occurred outside the courtroom and thus the inadequate state procedural rule

45

Furthermore, the Commonwealth's reliance on our opinion in Taylor v. Horn, 504 F.3d 416 (3d Cir. 2007), is unconvincing. In Taylor, the petitioner obtained an evidentiary hearing during his first PCRA hearing and, after the PCRA court denied the claim, unsuccessfully sought to present new expert witnesses testimony in a second PCRA petition raising the same claim. We affirmed the district court's denial of the request for an evidentiary hearing under section 2254(e)(2) despite the Pennsylvania Supreme Court's dismissal of Taylor's second PCRA petition pursuant to an inadequate state procedural ground: "Unlike the petitioner in Wilson, Taylor's competency claim was raised in his first PCRA petition and addressed on the merits. His resurrection of the claim in his second PCRA petition does not put it under Wilson's rule." Id. at 436-37. The procedural posture of Lark's case differs from that of the petitioner in Taylor inasmuch as Lark is not attempting to get two bites at the apple by requesting a district court hearing to present new evidence which was available at the time of his state court evidentiary hearing. Id. at 437 ("The only thing that prevented Taylor from presenting his new evidence of incompetency before the first PCRA court was a lack of diligence."). Rather, Lark is requesting a hearing because the state court prevented him from presenting his evidence in the first instance by the application of an inadequate procedural rule. In that respect, Lark's request, to the extent that his Batson

---

prevented Morris from presenting evidence in the only forum available to him. This rationale clearly was not the basis for our holding in Morris.

46

claim is based on the Commonwealth's pattern of discriminatory strikes, falls squarely within Morris' holding and, therefore, we find that section 2254(e)(2) did not prevent the District Court from granting him an evidentiary hearing on his Batson claim.

### D.      Merits of Lark's Batson Claim

### 1.      The AEDPA

We can understand why by this time a reader of this opinion would wonder whether we ever would reach the substantive issue on this appeal, i.e., did the District Court correctly grant Lark habeas corpus relief leading to his release or a new trial?  But our long discussion of the procedural and jurisdictional issues was necessitated by the remarkable complexity of the law governing habeas corpus petitions which to a large extent is the result of the interaction of state and federal law inherent in our dual sovereignty system.  In fact, solving the procedural and jurisdictional issues before we could reach the substantive issues on this appeal was a process much like solving Rubik's cube.  But we now reach the merits issue on this appeal.

Pursuant to the AEDPA, where a state court adjudicates the merits of a petitioner's claim, federal courts review the claim under a highly deferential standard.  See 28 U.S.C. § 2254(d)(1) & (2); Cullen v. Pinholster, 131 S.Ct. 1388, 1398 (2011).  As we have indicated, Lark properly presented the Batson claim based on the Commonwealth's pattern of jury strikes to the state courts in his second PCRA petition, but the state courts rejected that claim largely pursuant to what clearly was a state procedural rule inadequate to bar federal habeas corpus review.  When, as

47

here, the state courts do not adjudicate a claim on the merits, and that claim is presented properly to a federal court in a petition for a writ of habeas corpus, the deferential standards of the AEDPA do not apply.  See Coombs, 616 F.3d at 260 (citing Holloway, 355 F.3d at 718).  Therefore, for the most part a federal habeas corpus court considering Lark's Batson claim based on the Commonwealth's pattern of jury strikes should exercise de novo review.  Coombs, 616 F.3d at 261.  On the other hand, to the extent that the Supreme Court of Pennsylvania rejected Lark's Batson claim that he predicated on the McMahon tape on the merits we will assume that its decision is entitled to deferential review.  But that possibility is of no consequence on this appeal as the District Court did not rely on the McMahon tape to reach its conclusion and we are predicating our result on our determination that as a matter of federal law the District Court misapplied Batson.  Accordingly, our review is entirely de novo.

## 2. Batson Three-Step Analysis.

The Equal Protection Clause of the Fourteenth Amendment "prohibits a prosecutor from using a peremptory challenge to strike a prospective juror solely on account of race."  Holloway, 355 F.3d at 719 (citing Batson, 476 U.S. at 88, 106 S.Ct. 1712).  But "[a]s in any equal protection case, the burden is . . . on the defendant who alleges discriminatory selection of the venire to prove the existence of purposeful discrimination."  Coombs, 616 F.3d at 261 (quoting Batson, 476 U.S. at 93, 106 S.Ct. 1712) (internal quotation marks omitted).  We have held that the exclusion of even one vernireperson from the jury based on race requires that, under Batson, there be a new trial.  See Harrison v. Ryan, 909 F.2d 84, 88 (3d Cir. 1990).

48

As we stated earlier, typically the adjudication of a Batson violation proceeds in three steps: (1) the defendant must make a prima facie showing that the prosecution has exercised a peremptory challenge in a discriminatory manner; (2) once the defendant makes that prima facie showing, the prosecutor must offer a race-neutral reason for having exercised the challenge; (3) the trial court, weighing the parties' submissions, determines whether the prosecution's strike amounted to purposeful discrimination violating the Equal Protection Clause of the Fourteenth Amendment. Cockrell, 537 U.S. at 328-29, 123 S.Ct. at 1035. In this three-step process the prosecution has the burden of production of the race-neutral reason for the strike at the second step, but the burden of persuasion never shifts from the opponent of the peremptory strike. See Purkett v. Elem, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771 (1995) (per curiam).

The Commonwealth argues that we should not use the Batson three-step burden shifting procedure when making an analysis many years after the trial because the use of the procedure at that time is unfairly advantageous to the petitioner and greatly prejudicial to the Commonwealth. But our precedent clearly requires that we reject that argument. See, e.g., Hardcastle v. Horn, 368 F.3d 246, 255-56 (3d Cir. 2004) (applying three-step test in pre-Batson case where defense attorney did not object until after voir dire was completed); Love, 40 F.3d at 667 (applying three-step Batson analysis in a post-trial context).

Certainly, when the Supreme Court developed Batson's burden-shifting framework, it envisioned that, inasmuch as a timely objection would permit a prosecutor to explain use of the

49

challenges, a defendant would make an objection at trial to what he regarded was the prosecutor's racially based use of peremptory challenges. After all, as the Commonwealth argues, applying the burden shifting method several years after the trial makes it more difficult for the prosecution to provide a race-neutral explanation for peremptory strikes. Appellant's br. at 37-38 citing Carter v. Hopkins, 151 F.3d 872, 875-86 (8th Cir. 1998) (holding that it is inappropriate to apply Batson's burden shifting where there has been a long delay between jury selection and the filing of the claim, a voir dire record is not available, and the petitioner did not raise a timely objection); McCrory v. Henderson, 82 F.3d 1243, 1251 (2d Cir. 1996) (stating in dicta that where a Batson objection was raised over three months after trial, petitioner was not entitled to benefit of burden shifting rule).[29] Indeed, one reason that the Supreme

---

[29] Of course we recognize that in both McCrory and Henderson, unlike in this case, the defendants did not raise objections to the prosecutor's discriminatory exercise of peremptory challenges at their respective trials and, further, the voir dire was not recorded in either case. Carter, 151 F.3d at 873; McCrory, 82 F.3d at 1245. However, like the defendants in those cases, Lark did not raise a Batson claim until after the trial, and thus, in light of the passage of time between the voir dire and the time when a court first adjudicated the merits of the Batson claim, the prosecutor's faded memory rendered the three-step process analysis much more difficult for both Lark and the Commonwealth. See Holloway, 355 F.3d at 726 (explaining that a 17-year delay between trial and appellate review of a Batson claim "is certainly regrettable both for the Commonwealth and for Holloway . . . .").

50

Court applied <u>Batson</u> retroactively only in cases pending on direct review at the time that it decided <u>Batson</u> was the difficulty in applying <u>Batson</u> long after the trial. <u>See</u> <u>Allen v. Hardy</u>, 478 U.S. 255, 260-61, 106 S.Ct. 2878, 2881 (1986) (per curiam) (declining to hold <u>Batson</u> applicable to cases pending on collateral review when the Court decided <u>Batson</u>).

In recognition of the delay problem, we realize that it is one thing to apply <u>Batson</u> in the adjudication of a direct appeal that was pending when the Supreme Court decided that case but quite a different matter to apply it in a collateral proceeding many years later merely because a direct appeal had been pending in the case under review when the Supreme Court decided <u>Batson</u>. Thus, it is not surprising that we have a line of cases, discussed more extensively below, which provide guidance on how to approach a prosecutor's faded memory in the adjudication of <u>Batson</u> claims brought years after trial. But even in cases of delay in the assertion of a <u>Batson</u> claim, we never have adopted the Court of Appeals for the Eighth Circuit's reasoning that, in order to obtain <u>Batson</u> relief, a petitioner has to show "purposeful discrimination" outside of an ordinary burden shifting analysis. <u>Carter</u>, 151 F.3d at 875-76. We decline to do so now and therefore will analyze the merits of Lark's claim under the usual three-step burden shifting procedure.

### 3.    Step 1: The Prima Facie Case

The Supreme Court has indicated that in a determination of whether a petitioner has established a prima facie case under <u>Batson</u>, the prosecutor's pattern of peremptory strikes is significant as are the "prosecutor's questions and statements

51

during voir dire examination and in exercising his challenges . . . ." Batson, 476 U.S. at 96-97, 106 S.Ct. at 1723. Further, in making Batson determinations "we have identified several additional factors, including how many members of the cognizable racial group are in the venire panel; the nature of the crime; and the race of the defendant and the victim." Lewis, 581 F.3d at 103 (citations and internal quotation marks omitted).

Here, though the District Court indicated in its July 3, 2007 opinion and order that Lark established a prima facie Batson violation, it is unclear when, if ever, the Court actually made that finding. In its May 23, 2006 opinion, though the Court stated that Lark alleged facts which, if proven true, would establish a prima facie case under Batson, it noted that the Commonwealth disputed those facts and, indeed, it granted an evidentiary hearing, in part, to resolve that dispute. Lark I, 2006 WL 1489977, at *9; App. at 42. Those alleged facts supporting the prima facie case included the prosecution's high strike rate of African-American jurors, the absence of any obvious non-racial basis for the strikes in the voir dire transcripts, and the trial prosecutor's remark ("Oh. How awful") in response to defense counsel's objection to his pattern of discriminatory strikes. Id. at *8; App. at 41.

In its second opinion and order on July 3, 2007, the order from which the Commonwealth has appealed, the District Court, in a footnote, stated that it previously had found that Lark established a prima facie case and cited to its May 23 opinion in which it set forth the disputed facts. Lark II, 495 F. Supp. 2d at 501 n.10. But the problem with the Court's reference is that allegations are not findings. The Court then stated that Lark met his step-one burden based on the composition of the venire and

52

the pattern of strikes exercised by the Commonwealth.  <u>Id.</u>

The Commonwealth, however, does not challenge that Lark has established a prima facie <u>Batson</u> violation.[30]  We will assume that the District Court correctly concluded that Lark met his step-one burden based on the composition of the venire and the pattern of strikes Carpenter exercised.  Consequently, we find it necessary to consider the prosecutor's step-two explanation for the strikes.

### 4.    Step 2: A Race-Neutral Explanation

The Commonwealth argues that Carpenter's inability to explain the reasons for his use of three peremptory challenges at

---

[30] The Commonwealth does argue that Carpenter's pattern of strikes of African-American jurors is not sufficient to prove that any single strike was motivated by race.  Appellant's br. at 50-51.  Inasmuch as the District Court, at the third step, has a duty to determine whether Lark has established that Carpenter purposefully discriminated in the exercise of any of his peremptory challenges,  we will not address the Commonwealth's argument on this appeal.  After all, it is at the third step that the District Court must weigh all the facts and circumstances relating to Carpenter's intent, including the pattern of peremptory strikes Carpenter used against African-American jurors.  <u>See</u> <u>Jordan v. Lefevre</u>, 206 F.3d 196, 200 (2d Cir. 2000) ("[T]he third step of the <u>Batson</u> inquiry requires a trial judge to make 'an ultimate determination on the issue of discriminatory intent based on all the facts and circumstances.'").

the second step of the Batson analysis was not a sufficient ground to grant the conditional writ of habeas corpus because that inability along with the other information available to the District Court did not enable Lark to satisfy his ultimate burden of proving intentional discrimination. We agree with the Commonwealth's contention.

At step two, the Commonwealth has the burden to produce a race-neutral explanation but nevertheless the opponent of the peremptory strike retains the ultimate burden of proof on the Batson issue. See Purkett, 514 U.S. at 768, 115 S.Ct. at 1171 ("[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."). The prosecutor's burden at step two is not high as the explanation does not have to be persuasive, or even plausible. Id. at 767-68, 115 S.Ct. at 1171. Consequently, inasmuch as the Supreme Court "purposely set a relatively low bar at step two," we have held that it would be rare, but not entirely inappropriate, for a court to grant relief at that step. Hardcastle, 368 F.3d at 257; see also Harrison, 909 F.2d at 88 (holding that prosecution's failure to rebut petitioner's prima facie showing of racial discrimination as to one juror dictates the grant of a new trial). But see Yee v. Duncan, 463 F.3d 893, 899 (9th Cir. 2006) (holding that defendant bears the ultimate burden of proof and therefore step two never can be definitive because defendant only has raised an inference of discrimination).

Here the District Court found that Carpenter's failure to articulate any race-neutral justification for the strikes of three jurors mandated that it grant Lark habeas corpus relief. The first juror that Carpenter challenged that we consider is Shirley Sampson, an African-American female. Carpenter could not

54

recall why he struck Sampson and reading the transcript did not refresh his memory. Carpenter, however, unequivocally denied that he did so because she was African-American. Before proceeding to the next juror, the Commonwealth's attorney asked Carpenter whether where the juror lived could be a significant factor in exercising a peremptory strike. Carpenter answered that he did not want a juror who lived too close to the defendant or who lived close to the crime scene; however, he did not state that he struck Sampson for either of these reasons.

Similarly, Carpenter could not recall a specific reason for striking Florence Williams, an African-American female. Carpenter could not find anything "particularly wrong" with Williams by looking at the trial transcript (App. at 1044); he did, however, state that there were other circumstances that might not appear in the transcript, "[f]or example, if I don't like the juror, I think . . . it's a good bet she doesn't like me." Id. at 1045. When the District Court stated that "there could have been body language there," Carpenter responded by saying "exactly." Id. The situation was slightly different with respect to the third juror, Edison Sisco, an African-American male, even though Carpenter could not recall a specific reason for striking him. Carpenter did note that neither he nor defense counsel asked Sisco many questions and that Sisco was confused about the last school he attended. Ultimately, however, Carpenter stated that he could not recall a reason for exercising a strike to remove Sisco.

Carpenter's reasons for striking Sampson, Williams, and Sisco were inadequate to meet the Commonwealth's burden of production as explained in Hardcastle. Carpenter's statement that he might have struck Williams for reasons that did not

55

appear in the transcript is the type of vague explanation we have rejected as inadequate to meet the prosecutor's burden at the second <u>Batson</u> step.  <u>Hardcastle</u>, 368 F.3d at 258.  Further, Carpenter's unequivocal denial that he struck Sampson because of her race standing alone would not be an adequate explanation.  <u>See</u> <u>Purkett</u>, 514 U.S. at 769, 115 S.Ct. at 1771 (stating that a prosecutor cannot satisfy burden of production by denying that he had discriminatory motive or by merely affirming his good faith).  Finally, Carpenter did not have an independent recollection for striking Sisco.

As we indicated above, inasmuch as the Supreme Court's opinion in <u>Batson</u> was to a degree retroactive and applies to some trials held before <u>Batson</u>, as is the situation here, we have considered habeas corpus petitions that have led to proceedings at which a prosecutor sought to provide explanations for peremptory challenges years after the trial.  In <u>Harrison</u>, the first such case we encountered, the prosecutor used six of his eight peremptory challenges to strike all of the African-American venirepersons and could not recall his reasons for exercising a peremptory strike on one of the six African-American jurors he excluded during voir dire: "[j]ust looking at these notes, I don't know.  I don't have her age down here.  The fact that her son is a retired police officer, I assume she is an older woman.  That could have been a factor; I don't know."  909 F.2d at 87.  In <u>Harrison</u> we balanced the burden to the state of explaining strikes years made earlier against the interests of justice that <u>Batson</u> was designed to protect:

> Certain other factors, however, most notably the interests of justice, require retroactive application

56

of <u>Batson</u> for cases on direct review even where a long period of time occurs in the state court appellate process. This is especially true here where defense counsel timely objected to the use of peremptory challenges, the number of peremptory challenges exercised against Blacks was so great, the race neutral reasons given for striking other black jury venirepersons were so weak, and the prosecutor was unable to articulate a race neutral reason for striking one of the black venirepersons.

<u>Id.</u> at 87-88. Ultimately, we held that the prosecution's failure to rebut Harrison's prima facie showing of racial discrimination at the second step mandated the grant of a new trial. <u>Id.</u> at 88.

In <u>Johnson v. Love</u> we held that "the <u>Batson</u> inquiry ends and the conviction must be vacated at the second stage of the analysis if the state's explanation is such that, taken at face value, it either demonstrates an equal protection violation or would otherwise be inadequate as a matter of law to support the conviction." <u>Love</u>, 40 F.3d at 668 (citations omitted). In <u>Love</u>, the prosecutor's explanation for striking a young black juror was that she would not be sympathetic to the victim of petitioner's crime because the victim solicited sexual favors from young black boys prior to his death. We held that this was not a race-neutral explanation because the assumption underlying the prosecution's answer was "based on a stereotypical view or intuition that black people, because of their race, will relate to other black persons in a way that may preclude them from basing a verdict solely on the relevant evidence." <u>Id.</u>

57

In <u>Love</u> we also addressed a situation in which a prosecutor's faded memory affects his ability to recall reasons for a particular peremptory challenge:

> There will undoubtedly be post-conviction relief proceedings in which the state, by reason of death, absence, or faded memory, will be unable to produce a prosecutor with a specific recollection of the reason for a challenge alleged to violate <u>Batson</u>. Courts frequently are required to draw inferences from circumstantial evidence regarding a decision-maker's state of mind, however, <u>and we are unwilling to rule out the possibility that the state may be able to satisfy its step two Batson burden by tendering circumstantial evidence. In some post-conviction relief proceedings, it may well be possible to reach a reliable conclusion regarding the true reasons for the challenge based upon the nature of the case, the transcript of the voir dire of the challenged juror and other prospective jurors, contemporaneous notes of the attorneys involved, and any other available evidence.</u>

<u>Id.</u> at 667 (emphasis added). In a footnote, we distinguished <u>Harrison</u> by stating that the absence of any explanation mandated relief in that case but that <u>Harrison</u> does not suggest that a state should not be permitted to reconstruct a prosecutor's rationale for excluding a juror when the prosecutor cannot explain his motivation for a strike due to his faded memory. <u>Id.</u> at 667 n.4.

58

Ten years later, in Hardcastle v. Horn we held that the Pennsylvania Supreme Court unreasonably applied Batson when it proceeded to the third step of the analysis without finding that the Commonwealth at the second step gave an adequate justification for the use of peremptory challenges. 368 F.3d at 259. In Hardcastle, a case tried before Batson where Batson became retroactively applicable on direct appellate review, the petitioner's trial counsel did not raise an objection during voir dire but did file a post-voir dire motion under Swain arguing that the prosecutor's use of peremptory strikes violated the federal and state constitutions. The trial court denied the motion and also denied the prosecutor's request to state her reasons for exercising the peremptory strikes. But an en banc panel of the Court of Common Pleas voted to grant a new trial based on the jury selection issue. On the initial appeal, the Pennsylvania Superior Court reversed the grant of a new trial, finding that Hardcastle failed to make the required showing under Swain. Id. at 251.

On further appeal, the Pennsylvania Supreme Court, which heard Hardcastle after the Supreme Court decided Batson, conducted its own review of the record and held that the prosecutor's opportunity to observe the jurors during voir dire and her decision not to remove two African-American venirepersons constituted race-neutral reasons for two peremptory strikes. Thus it determined that Hardcastle failed to make a prima facie showing that the prosecutor's strikes violated the equal protection clause. Id. at 253. The district court granted Hardcastle a writ of habeas corpus, and, on the Commonwealth's appeal, we affirmed, as we found that the reasons the Pennsylvania Supreme Court accepted for the

59

striking of the two African-American jurors did not satisfy the Commonwealth's minimal burden of production at the second step inasmuch as the record did not contain any evidence of the two jurors' demeanor or the prosecutor's observation or impressions. Thus, we found that the Supreme Court's explanation amounted "to nothing more than a statement that the prosecutor acted on intuition and with the absence of discriminatory intent." Id. at 258.

In 2005, in Wilson v. Beard there was a Batson challenge in a case in which Jack McMahon had been the prosecutor. The district court in the habeas corpus proceedings, in light of the fact that 20 years had elapsed between the time of the trial and the hearing at which McMahon explained his reasons for striking jurors at the trial, concluded that it would have been unreasonable to expect McMahon to remember reasons for his individual strikes. 426 F.3d at 668. Rather, the district court held that the race-neutral reasons McMahon offered in the McMahon tape were sufficient to carry the Commonwealth's burden at the second step. Inasmuch as we upheld the district court's conclusion that Wilson proved intentional discrimination, we did not need to decide whether the district court's ruling with respect to the second step was correct. However, we did note that, in light of the passage of time between the trial and when McMahon offered his explanation for striking jurors, the district court appropriately lessened the Commonwealth's burden of production at the second step. Id.

Though, so far as we can ascertain, the United States Supreme Court never has addressed whether it is appropriate for a district court to grant a writ of habeas corpus at the second step because a prosecutor could not recall the reason for a

60

peremptory challenge many years after the trial, recent precedent suggests that courts should be reluctant to do so for they should act with caution before granting relief at that step of the Batson process and our own consideration of the issue leads us to reach the same conclusion. For example, in Purkett v. Elem the Court of Appeals for the Eighth Circuit, in a step-two analysis, concluded that the prosecutor's explanation that he used a peremptory challenge to strike a juror because the juror had long unkempt hair and suspicious facial hair was pretextual and was not a legitimate race-neutral reason for striking the juror. 514 U.S. at 766-67, 115 S.Ct. at 1770. But on further appeal the Supreme Court, reiterating that the burden never shifts from the defendant in a Batson dispute, held that the court of appeals improperly conflated the second and third Batson steps:

> [i]t is not until the third step that the persuasiveness of the justification becomes relevant-the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination. At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination. But to say that a trial judge may choose to disbelieve a silly or superstitious reason at step three is quite different from saying that a trial judge must terminate the inquiry at step two when the race-neutral reason is silly or superstitious. The latter violates the principle that the ultimate burden of persuasion regarding racial motivation

61

> rests with, and never shifts from, the opponent of the strike.

Purkett, 514 U.S. at 768, 115 S.Ct. at 1771 (internal citations omitted).  The Supreme Court also stated that the requirement in Batson that a prosecutor "must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges" only "was meant to refute the notion that a prosecutor could satisfy his burden of production by merely denying that he had a discriminatory motive or by merely affirming his good faith. . . . [A] 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection."  Id., 115 S.Ct. at 1771 (quoting Batson, 476 U.S. at 98, n.20, 106 S.Ct. at 1724 n.20.).

More recently, the Supreme Court discussed a second-step issue in Johnson v. California, 545 U.S. 162, 125 S.Ct. 2410 (2005).  California law required an objector, in order to establish a prima facie Batson case, to show that it was more likely than not that the other party's peremptory challenges, if unexplained, were based on impermissible bias.  Id. at 168, 125 S.Ct. at 2416.  The respondents, defending the California law, contended that a Batson claimant must prove discrimination by a preponderance of the evidence at the first step or else "a prosecutor's failure to respond to a prima facie case would inexplicably entitle a defendant to judgment as a matter of law on the basis of nothing more than an inference that discrimination may have occurred."  Id. at 170, 125 S.Ct. at 2417.  The Court held that this standard was too onerous and not a proper application of Batson because the first two steps in the Batson process govern only the production of evidence and the defendant ultimately retains the burden to prove the existence of

62

purposeful discrimination. The Court also reiterated <u>Purkett</u>'s holding that even if the state produces "frivolous or utterly nonsensical justifications for its strike," the analysis moves to step three. <u>Id.</u> at 171, 125 S.Ct. at 2417. Then, in a footnote, the Court added:

> In the unlikely hypothetical in which the prosecutor declines to respond to a trial judge's inquiry regarding his justification for making a strike, the evidence before the judge would consist not only of the original facts from which the prima facie case was established, but also the prosecutor's refusal to justify his strike in light of the court's request. Such a refusal would provide additional support for the inference of discrimination raised by a defendant's prima facie case. <u>Cf.</u> <u>United States ex rel. Vajtauer v. Comm'r of Immigration,</u> 273 U.S. 103, 111, 47 S. Ct. 302, 71 L. Ed. 560 (1927).

<u>Johnson</u>, 545 U.S. at 171 n.6, 125 S.Ct. at 2417 n.6.

While obviously intended to apply to an objection made during voir dire, the <u>Johnson</u> footnote indicates that the prosecutor's lack of response is evidence to be taken into account only at step three and is not, by itself, of such dispositive force that it establishes that there was a <u>Batson</u> violation. Following that line of reasoning this case presents a more compelling argument for proceeding to the third step of the inquiry. The District Court's holding that the <u>Batson</u> inquiry ends if the state fails to meet its duty of production is accurate

63

only if the prosecution, at step two, demonstrates that it based its challenge on a reason that was an equal protection violation. Purkett, 514 U.S. at 769, 115 S.Ct. at 1771; see also Hernandez v. New York, 500 U.S. 352, 360, 111 S.Ct. 1859, 1866 (1991) (plurality opinion) ("Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.").

Unlike the Supreme Court's hypothetical prosecutor in Johnson, Carpenter's "silence" was a product of his failure to recall specific reasons for his three peremptory strikes. Carpenter's inability to recall his reasons for exercising peremptory strikes 21 years after the trial surely is far less suggestive that at the trial there had been purposeful discrimination than a prosecutor's outright refusal to answer the trial court's inquiry at voir dire directly after the prosecutor exercised the peremptory challenge. After all, when at a trial the prosecutor is asked to explain the reasons for his challenge they should be fresh in his mind. Further, it would be anomalous to hold that "an utterly nonsensical" reason would have satisfied the Commonwealth's burden of production at step two of the Batson process, as it could have done, but that Carpenter's failure to recall race-neutral reasons, or any reasons for strikes, 21 years after the trial automatically should result in a finding that his strikes were the product of discriminatory intent. Johnson, 545 U.S. at 171, 125 S.Ct. at 2417.

More importantly, the Supreme Court in Johnson rejected the argument that a prosecutor's failure to respond to a prima facie case "would inexplicably entitle a defendant to judgment as a matter of law on the basis of nothing more than an inference that discrimination may have occurred." Id. at 170, 125 S.Ct. at

64

2417. Instead, the Supreme Court strongly suggested that Batson's burden-shifting framework is simply a means of presenting evidence. The Court compared the Batson framework to the burden-shifting found in Title VII employment discrimination cases.[31] Id. at 171 n.7, 125 S.Ct. at 2418 n.7 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509-510 & n.3, 113 S.Ct. 2742, 2748 & n.3 (1993) (holding that determinations at steps one and two of the McDonnell Douglas framework "can involve no credibility assessment" because "the burden-of-production determination necessarily precedes the credibility-assessment stage," and that the burden-shifting framework triggered by a plaintiff's prima facie case is essentially just "a means of 'arranging the presentation of evidence'")). In a Title VII case, even if the defendant fails to introduce evidence of a nondiscriminatory reason for an adverse employment action, it still can avoid liability if the plaintiff's prima facie case "is held to be inadequate in law or fails to convince the factfinder." St. Mary's Honor Ctr., 509 U.S. at 510 n.3, 113 S.Ct. at 2748 n.3.

---

[31] The Supreme Court established the three-step employment discrimination framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973). Under that burden-shifting framework, the plaintiff first has to make out a prima facie case of discrimination at which point the burden shifts to the employer to present a nondiscriminatory reason for the adverse employment action and, finally, the employee has to demonstrate that the reason the employer gives is pretextual. Donlin v. Philips Lighting N. Am. Corp., 581 F.3d 73, 78 (3d Cir. 2009).

Here, the District Court clearly erred when it ended the Batson analysis at the second step of the three-step analysis even though, as we have indicated, Carpenter's reasons for striking Sampson, Williams, and Sisco were inadequate to meet the Commonwealth's burden of production as we explained the burden in Hardcastle. First, though Carpenter failed to recall the reasons for exercising three peremptory strikes to remove African-American jurors, Lark's prima facie case was not as strong as the petitioner's prima facie case was in Harrison. In contrast to the prosecutor in Harrison who struck all the African-Americans from the jury, Carpenter did not strike four African-Americans and had five peremptory strikes remaining at the end of voir dire. See United States v. DeJesus, 347 F.3d 500, 509 (3d Cir. 2003) ("Another factor that makes the government's race-neutral explanation more believable is that one Hispanic and three African Americans were seated in the final jury, and the government had three peremptory strikes remaining."). [32] Nor was this a case, as was Hardcastle, where a state court attempted to fashion race-neutral explanations without holding an evidentiary hearing to give the prosecutor a chance to explain the reasons behind the peremptory strikes. 368 F.3d at 252. Rather, Carpenter's memory loss, understandable considering

---

[32] Of course, it has not escaped our attention that the composition of Lark's jury--four African-Americans and eight Caucasians--is described on the McMahon tape as the ideal jury. We also note, however, that the District Court made a factual finding after the evidentiary hearing that, although Carpenter knew McMahon, McMahon never was his senior or supervisor in the District Attorney's Office and never instructed Carpenter on how to select a jury. Lark II, 495 F. Supp. 2d at 494.

the 21-year gap between the challenges and the evidentiary hearing, prevented him from offering direct reasons behind the exercise of his peremptory challenges.

In addition, the District Court found that Carpenter was not systematic in his note taking and that the only notes he took were symbols and notations he made by each juror's name on the jury list. 495 F. Supp. 2d at 495. The notes were incomplete inasmuch as two of the jurors whom Carpenter could not recall striking do not appear on the juror sheets on which Carpenter took his notes. The other contemporaneous evidence of Carpenter's state of mind is his response of "Oh. How awful" to Rogers' complaint that he was striking all African-Americans from the panel. Carpenter explained that he was being sarcastic because he recognized that Rogers was attempting to raise race as an issue. Carpenter further testified that he used sarcasm at other points in the trial when he became frustrated with Rogers' tactics. It is not clear whether the Court believed that Carpenter's explanation of his comment was credible.

There were, moreover, compelling reasons for the Court to advance to the third step of the Batson analysis. To start with, the Supreme Court has suggested that Batson's burden shifting framework is a means to present evidence and thus the prosecution's presentation of only thin evidence at the second step, though perhaps damaging to its case, is not dispositive on the question of discriminatory intent. Johnson, 545 U.S. at 170-71, 125 S.Ct. at 2417-18. Proceeding to the third step would have allowed the District Court to judge whether Carpenter's strikes violated the Equal Protection Clause through juror comparisons, thus fulfilling the principal goal of Batson: "to produce actual answers to suspicions and inferences that

discrimination may have infected the jury selection process." Id. at 172, 125 S.Ct. at 2418.

The District Court's acceptance of Lark's prima facie case as dispositive proof of Carpenter's intent substituted inferences for an actual answer to the question of whether Carpenter discriminated in the selection of jurors. We hold that the District Court, by moving to the third step, could have weighed all of the evidence against Lark's prima facie case. Instead, the District Court's approach validated the fears of the respondents in Johnson: the prosecutor did not come forward with evidence at the second step and Lark received "judgment as a matter of law on the basis of nothing more than an inference that discrimination may have occurred." Id. at 170, 125 S.Ct. at 2417.

Moreover, this case presents an unusual situation in which neither party may be held culpable for the delay in the adjudication of the Batson claim. Nevertheless, we see some merit to the Commonwealth's contention that Lark should have been more diligent in pursuing the claim even though, as our discussion of procedural default demonstrates, Pennsylvania's "relaxed waiver" policy created a post-conviction climate in which the state courts would waive procedural rules in capital cases. After all, following the Supreme Court of Pennsylvania's affirmance of his conviction and sentence on direct appeal, Lark did not file any further proceedings for six years in state or federal court seeking relief even though his life literally was at stake. Furthermore, we do not fault the Commonwealth courts for enforcing their procedural rules to deny Lark an evidentiary hearing. As we noted in Hardcastle, "while the retroactive application of the Supreme Court's ruling in Batson undeniably

68

causes many problems, we do not believe the weight of this burden should be borne solely by the Commonwealth." 368 F.3d at 261. By terminating its Batson analysis at the second step, the District Court shifted the entire consequences of Carpenter's memory loss to the Commonwealth, and thus allowed Lark to obtain a writ of habeas corpus by showing only a prima facie case of discrimination.

Finally, we have indicated that it is appropriate to lessen the state's burden at the second step where the passage of time diminishes the prosecutor's recollection of voir dire. Wilson, 426 F.3d at 668. Indeed, the Supreme Court's limitation of the retroactive application of Batson to cases on direct appeal when it decided that case and not applying its holding to cases on collateral review at the time of that decision, indicates that the Court envisioned problems such as those present here in applying Batson years after the trial. We think that proceeding to the third step of the Batson analysis is preferable to the alternative: overturning a 25-year-old jury verdict which the Pennsylvania Supreme Court has upheld against numerous challenges and which seems to have been predicated on substantial evidence merely because it would be possible to draw an inference of discrimination in jury selection.

We hold that given the recent Supreme Court case law and the particular circumstances of this case, the District Court should have proceeded to the third step of the Batson analysis.

## V.    CONCLUSION

Inasmuch as we have determined that the District Court

69

improperly applied <u>Batson</u>, we will vacate its order, remand the case to the District Court, and direct that the Court perform the third step of the <u>Batson</u> analysis.[33]  Both parties make arguments regarding the McMahon tape's relevance and the Baldus study's reliability.  However, inasmuch as the District Court explicitly declined to consider these issues, <u>see</u> <u>Lark</u> II, 495 F. Supp. 2d at 503 n.12, we do not address them on this appeal, though they may become significant on the remand.

The District Court based its decision on the pattern of the prosecutor's strikes and Carpenter's inability to articulate a justification for three of those strikes.  Any other evidence or arguments which relate to intentional discrimination, such as juror comparisons, properly are made at the third <u>Batson</u> step and we will not consider them at this time.  <u>Miller-El</u>, 545 U.S. at 241, 125 S.Ct. at 2325 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at <u>Batson</u>'s third step.").  Ultimately, it is at the third step that the District Court must make a finding regarding the prosecutor's motivation in exercising the challenged strikes.  <u>See</u> <u>Bond v. Beard</u>, 539 F.3d 256, 264 (3d Cir. 2008).

For the foregoing reasons we will vacate the District Court's order entered on July 5, 2007, granting Lark a

---

[33] Of course,  if on the remand the District Court rejects Lark's <u>Batson</u> contention, it should consider the other contentions that he advanced but that the Court had no need to address.  Some of these contentions likely will involve complex jurisdictional, procedural, and substantive questions.

conditional writ of habeas corpus, and remand the case for the further proceedings that we have indicated in this opinion are required. No costs shall be allowed on this appeal.

*Lark v. Beard, 07-9004*

McKee, *Chief Circuit Judge*, concurring


I join the majority opinion in its entirety, and fully agree with the remand to the District Court to complete the third step of the *Batson* analysis. However, I write separately to emphasize that although my colleagues note that "we have indicated that it is appropriate to lessen the state's burden at the second step where the passage of time diminishes the prosecutor's recollection of voir dire," Maj. Op. 58 (citing *Wilson*, 426 F.3d at 668), we have not done so here. The majority properly concludes that the Commonwealth failed to meet its burden at step two of the *Batson* analysis because the prosecutor failed to offer race-neutral reasons for striking three jurors. Thus, in this case, the majority's discussion of the appropriateness of lessening the state's burden of production when the prosecutor has a faded memory at step two of the *Batson* analysis is purely dicta, and rightfully so.

In *Wilson*, we stated: "[I]n light of the passage of time, we agree with the District Court that it was appropriate to lessen the burden of the Commonwealth at step two." 426 F.3d at 668. However, in *Wilson*, unlike here, it does not appear that a timely objection was made at trial to the prosecutor's discriminatory exercise of peremptory strikes. *See Abu-Jamal*, 520 F.3d at 280 n.3. As the majority quite correctly notes, Lark's attorney raised what was to become a *Batson* claim during voir dire. Accordingly, the prosecutor was immediately put on notice that he may later have to explain his motivations in peremptorily striking Black jurors.

The majority suggests that the prosecutor's burden must necessarily be reduced at step two when the prosecutor's faded memory results from a long passage of time between voir dire and a *Batson* hearing. However, that principle should not apply when, as here, a timely objection is made to the prosecutor's use of peremptory strikes. Under such circumstances, the fact finder may conclude that the claim of faded memory and failure to memorialize the reasons for certain strikes is less credible than might otherwise be the case. I do not suggest that this necessarily undermines a

1

subsequent claim of failed memory.  However, I also do not think it appropriate to suggest that the claim of failed memory must receive the same credibility and consideration afforded the prosecutor in *Wilson.*  Rather, the District Court must be free to assess the credibility of the claim of failed memory during its step three *Batson* analysis on remand.

On remand, the District Court will have to decide whether, and to what extent, the prosecutor's subsequent claim of failed memory should be credited given the very unique circumstances here and the fact that he was immediately informed that his motivations may be examined at a later date.